U S DISTRICT COURT
DIST OF N.H.
FILED

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

2012    -8  P 2 26

I, David Furtado, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this one (1) common affidavit in support of a three (3) separate

Applications for Search Warrants for information associated with certain accounts that are stored

at premises owned, maintained, controlled, or operated by:  (a) Google, Inc., of Mountain View,

California, a web hosting email provider that hosts Gmail; (b) Yahoo, Inc., of Sunnyvale,

California, a web hosting email provider that hosts Yahoo and Rocketmail, and, (c) Microsoft, of

Redmond, Washington, a web hosting email provider that hosts Hotmail.  The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of applications for search warrants under 18 U.S.C. Section 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Google, Yahoo, and Microsoft to disclose to the government records

and other information in its possession pertaining to the subscriber or customer associated with

the accounts, including the contents of communications.

2.      I am a Special Agent with the Office of Criminal Investigations, United States

Food and Drug Administration (hereinafter "FDA/OCI") and report to the Boston, Massachusetts

Resident Office.

3.      I have been a Special Agent with FDA/OCI since April 2004.  Prior to my employment with FDA/OCI, I conducted criminal investigations as a Special Agent with the United States Department of Health and Human Services (HHS), Office of the Inspector General for approximately seven years.  These investigations related to fraud, waste, and abuse in HHS programs including investigations of individual practitioners, medical providers, and pharmaceutical manufacturers.   I have attended numerous federal agency sponsored training courses and the Federal Law Enforcement Training Center.

4.      As a Special Agent with FDA/OCI, I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act (hereinafter "FFDCA"), Title 21, United States Code, Section 301, *et seq*., and other federal statutes enforced by the United States Food and Drug Administration (hereinafter "FDA").

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.      I along with agents from Homeland Security Investigations (hereinafter "HSI") and the Federal Bureau of Investigation (hereinafter "FBI") are currently investigating a series of websites that sell both controlled and non-controlled prescription drugs.

7.      On September 17, 2010, U.S. Magistrate Judge Landya B. McCafferty authorized a search warrant for the email account Niki.meds@Gmail.com.  In summary, that search warrant was authorized based on probable cause that the email account Niki.meds@Gmail.com,

maintained at Google, contained evidence of the commission of the: (a) introduction into interstate commerce of unapproved new drugs (Title 21 U.S.C. Sections 331(d) and 355(a)); (b) distribution of controlled substances, based on several purchases of the controlled substance Valium made by a resident of New Hampshire from the websites Premiummedz.com and Generictab.com without proper DEA registration (Title 21 U.S.C. Sections 841 and 846); and (c) trafficking in counterfeit merchandise, based on the purchase of "Cialis" made by a consumer from the website Premiummedz.com (Title 18 U.S.C. Section 2320(a)).

8.      On June 10, 2011, U.S. Magistrate Judge Landya B. McCafferty authorized a search warrant for 65 email accounts maintained at Google, Yahoo, Microsoft, and AOL.  In summary, that search warrant was authorized based on probable cause to believe that violations of federal criminal law had been committed, specifically: (a) introduction into interstate commerce of unapproved new drugs (Title 21 U.S.C. Sections 331(d) and 355); (b) introduction into interstate commerce of misbranded drugs (Title 21 U.S.C. Sections 331(a) and 352(f)(1) and 353(b)(1); (c) distribution of controlled substances (Title 21 U.S.C. Sections 841 and 846); and (d) trafficking in counterfeit merchandise (Title 18 Section U.S.C. Section 2320(a)); and that there was probable cause to believe that evidence of these crimes and contraband or fruits of these crimes were located in these email accounts.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal criminal law have been committed, specifically: (a) introduction into interstate commerce of unapproved new drugs (Title 21 U.S.C. Sections 331(d) and 355); (b) introduction into interstate commerce of misbranded drugs (Title 21 U.S.C. Sections 331(a), 352(f)(1), and 353(b)(1)); (c) distribution of controlled substances (Title 21 U.S.C. Sections 841 and 846); and (d) trafficking in counterfeit merchandise (Title 18

Section U.S.C. Section 2320(a)).  Further, based on my review of the emails obtained pursuant to the above referenced search warrants executed on the email accounts, there is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## **LEGAL BACKGROUND**

10.     The FDA is responsible for enforcing the provisions of the FFDCA.  Under the FFDCA, the term "drug" includes articles which are intended (1) for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man and (2) to affect the structure or any function of the body of man. 21 U.S.C. § 321(g)(1)(B) and (C).

11.     Under the FFDCA, the term "new drug" includes any drug which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.  21 U.S.C. § 321(p)(1).

12.     Pursuant to the FFDCA, a "new drug" may not be introduced into interstate commerce unless a New Drug Application or Abbreviated New Drug Application has been approved by FDA. 21 U.S.C. § 355(a).

13.     Pursuant to Title 21, United States Code, Section 353(b)(1), prescription drugs are defined as those drugs which (1) because of their toxicity and other potential harmful effects, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs, or (2) were approved by FDA for use only under the supervision of a licensed practitioner.

14.     Title 21, United States Code, Section 353(b)(1) provides that a prescription drug may be dispensed only upon the prescription of a licensed practitioner.  Dispensing a

prescription drug without the prescription of a licensed practitioner is deemed to be an act which results in the drug being misbranded while held for sale.

15.     Pursuant to Title 21, United States Code, Section 352(f)(1), a drug is misbranded for purposes of Section 331 if its labeling fails to bear adequate directions for use. Pursuant to FDA regulations, "adequate directions for use" means directions under which a lay person could use the drug safely and for the purpose for which it was intended. Directions for use may be inadequate if the directions do not contain, among other things, information concerning the appropriate dosages for each of the intended uses of the drug, the frequency and duration of administration, the route or method of administration, and the preparation for use (21 C.F.R. Section 201.5).

16.     Pursuant to Title 21, United States Code, Section 331, the following acts and the causing thereof are prohibited:  the introduction or delivery for introduction into interstate commerce of any drug that is misbranded (21 U.S.C. Section 331(a)); the receipt in interstate commerce of any drug that is misbranded, and the delivery or proffered delivery thereof for pay or otherwise (21 U.S.C. Section 331(c)); and the introduction or causing the introduction into interstate commerce of an unapproved new drug (21 U.S.C. Section 331(d)).

17.     The Controlled Substances Act (the CSA) created a closed system of distribution for prescription drugs classified as controlled substances because of their potential for abuse. Pursuant to Title 21, United States Code, Section 841, it is unlawful to manufacture, distribute, dispense or possess controlled substances unless authorized by the CSA and its regulations. Pharmacies that dispense controlled substances must be registered with the Drug Enforcement Administration (DEA). For a prescription of a controlled drug to be effective, it must comply with Title 21, Code of Federal Regulations, Section 1306.04(a). This Section provides that a

prescription for a controlled substance is effective only if it is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription not issued in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Title 21, United States Code, Section 829, and the person knowingly filling such a prescription, as well as the person issuing it, is subject to the penalties provided for violations of the provisions or laws relating to controlled substances.

18.     On October 15, 2008, the Ryan Haight Online Pharmacy Consumer Protection Act (hereinafter "Ryan Haight Act") was enacted and amended the CSA and Controlled Substances Import and Export Act by adding several new provisions to prevent the illegal distribution and dispensing of controlled substances by means of the Internet. The Ryan Haight Act, which became effective April 13, 2009, makes it illegal under federal law to deliver, distribute, or dispense a controlled substance by means of the Internet, except as authorized by the CSA. In summary, the Ryan Haight Act requires an in-person medical evaluation before the issuance of a valid prescription for a controlled substance and that any person who operates a website that fits within the definition of an "online pharmacy" must obtain a registration from the Drug Enforcement Administration (hereinafter "DEA"). An "online pharmacy" is defined as a person, entity, or Internet site, whether in the U.S. or abroad, that knowingly or intentionally delivers, distributes, or dispenses...a controlled substance by means of the Internet. This definition includes, among others (1) any website that sells, or offers to sell, any controlled substance or a prescription therefore to a person in the U.S., (2) any person who operates such a

website, (3) any pharmacy that knowingly or intentionally fills prescriptions for controlled substances that were issued to customers of such a website, and (4) any person who sends an email that: offers to sell a controlled substance or a prescription for a controlled substance in a manner not authorized by the Act; directs buyers to a website operating in violation of the Act; or otherwise causes or facilitates the delivery, distribution, or dispensing of a controlled substance in a manner not authorized by the Act.

19.     Based upon my experience participating in other cases involving Internet pharmacies, I know that Internet pharmacies commonly advertise themselves to customers as legal sellers of prescription drugs, including controlled substances, even though the customer has no or very little contact with a doctor. The Internet pharmacies typically allow their customers to choose the drugs they want to purchase instead of allowing a physician to determine the appropriate treatment based upon an evaluation of the customer's symptoms, medical history and other factors that a legitimate doctor would consider before making a diagnosis and formulating a treatment plan. Internet pharmacies sometimes ask customers to fill out a superficial questionnaire containing questions about the customers' health. This questionnaire may then be reviewed by a doctor affiliated with the website before the drugs are shipped to the customer. The customers of these Internet pharmacies are not examined by the prescribing physician and often are not even located in the same state as the prescriber. Some Internet pharmacies do not ask any health questions and do not require a prescription from a doctor before unlawfully dispensing the prescription drug.

20.     New Hampshire state law, RSA 318.37, governs the licensure of pharmacies in New Hampshire as well as mail-order pharmacies operating outside of New Hampshire. It requires that any person who operates a pharmacy in New Hampshire for the retail sale of drugs

must be registered with the Board of Pharmacy.  It further provides that mail-order pharmacies located outside of the State may not ship, mail, or deliver prescription drugs into the state unless the pharmacy is registered with the New Hampshire Board of Pharmacy.

## CURRENT INVESTIGATION AND UNDERCOVER PURCHASES MADE FROM WEBSITES

21.     Based on a review of emails from the email account Niki.meds@Gmail.com, Premiummedz.com was identified as part of a larger network of websites that sell both controlled and non-controlled prescription drugs to consumers throughout the world.  In one email sent on May 13, 2010, Niki.meds@Gmail.com wrote that 2010 is Premiummedz' 10 year anniversary of the mother company for more than 75 affiliated websites, that Premiummedz is the leading controlled substance company for more than 10 years and has more than two million satisfied customers worldwide.  Two of the affiliated websites have been identified as 101generic.com and Epharm4u.com.

22.     Between September 2011 and January 2012, a series of purchases were made from these websites where investigators were able to purchase misbranded/counterfeit prescription drugs, including controlled substances, without a prescription from a licensed practitioner and without consultation with a medical professional. A summary of each purchase follows.

### UC Buy 1 – WWW.101GENERIC.COM

23.     On September 7, 2011, I accessed the website WWW.101GENERIC.COM, which was hosted on IP address 91.221.222.1[1], and placed an order for 40 - 20mg Cialis tablets and 60 - 2mg Xanax tablets.  No medical questionnaire was completed and at no time was a prescription

---

[1] According to RIPE.net, the Net Name for the IP address 91.221.222.1 is Moego-Net, Moego Holdings limited, Nicosia, Cyprus. Per a review of Niki.meds@Gmail.com emails, Moego Holdings is one entity located in Cyprus that customers were instructed to send wire transfers to pay for the prescription drugs they ordered.

required to place the order.  On September 14, 2011, I logged onto my account at WWW.101GENERIC.COM , clicked on the tab "Track Your Order", and was redirected to www.Medsupportonline.com where the order status was listed as "Pending Contact Support".  I then contacted online customer support and started a chat session at http://messenger.providesupport.com and was put in touch with Audrey (although the screen identified the person as "Levi").  After providing my order number, I was informed that they needed to verify my order via phone and shortly thereafter I received a phone call from telephone number 888-920-0540.  As of February 2011, the subscriber to this phone number was Yahalom 3000 Ltd[2] of Israel, the call center identified in my previous affidavit.  Further, telephone subscriber records indicate that Online365 of Ramat Gan, Israel was the subscriber for this telephone number until February 2011 when the business was sold to one of their employees.

24.      During the call, order details, shipping information, and credit card details were confirmed. I was then instructed to check with my bank and "authorize an international transaction".  I was also provided a telephone number of 888-837-4705 (which is also subscribed to by Yahalom 3000 Ltd) as the customer service point of contact. On September 14, 2011, I received an email from Support@Medsupportonline.com informing me that the order had been approved.

25.      On September 16, 2011, an email was received from Support@Medsupportonline.com informing me that the packages had been shipped with tracking numbers 0310 0480 0000 4587 7687 and 9400 1102 0082 8157 4917 23.  The email stated that the charge on the credit card would appear as the descriptor "MD

---

[2] A search of Facebook revealed an entity Yahalom 3000 Sales and Telemarketing Services LTD operating in Ramat Gan, Israel founded by Eliad Yahalom in 2006. According to its Facebook page, Yahalom 3000 is a sales and marketing company that works worldwide and sells products for the American market.

Online/HEALTHMED4U/medbynet".   Finally, investigation has revealed that the credit card

statement for this purchase listed a descriptor of "HEALTHMED4U" and was processed by JSC

Liberty Bank located in Tbilisi, Georgia.

      26.     On September 19, 2011, a package with tracking number 0310 0480 0000 4587

7687 was received at a PO Box maintained by FDA in New Hampshire. The package was sent

with a return address of Steve Vasquez, 271 Lakeview Ct, Cary, NC 27518. The package was

found to contain 23 blister packs, 2 tablets per pack, marked "Cialis 20mg Lilly" with a lot

number of 05668 and expiration date of 04 2014. According to Eli Lilly, the manufacturer of

Cialis, batch number 05668 is not a valid batch number.

      27.     Subsequent lab analysis conducted by both the FDA/Forensic Chemistry Center

(hereinafter "FCC") and Eli Lilly confirmed that the "Cialis" tablets were counterfeit, did not

contain tadalafil, the active ingredient found in authentic Cialis, and instead contained sildenafil,

the active ingredient found in authentic Viagra.

      28.     On September 21, 2011, a second package with tracking number 9400 1102 0082

8157 4917 23 was received at the PO Box in New Hampshire. The package was sent with a

return address of Global Inc, 5440 Crenshaw Blvd, #44, Los Angeles, CA 90043-2408. An

inventory of this package found that it contained one prescription bottle labeled "Xanax, 2mg,

Batch # X2-GG24900, MFG Date 05-2010." Inside the bottle were 61 tablets scored "Xanax" on

one side and "2" on the other side of the tablet.

      29.     Subsequent lab analysis conducted by both FCC and Pfizer confirmed that the

"Xanax" tablets were counterfeit, did not contain alprazolam, the active ingredient found in

authentic Xanax, and instead contained chlorpheniramine maleate, an allergy medication used to

treat hay fever and other respiratory allergies.

30.     Investigation has revealed that both packages were tracked by an IP address that appears to originate in the Ukraine. In addition, the package containing the Xanax was also tracked by an IP address that appears to originate in Dubai, United Arab Emirates.

**UC Buy 2 – EPHARM4U.COM**

31.     On September 19, 2011, an HSI special agent and I accessed the website WWW.EPHARM4U.COM, hosted on IP address 91.221.222.1, and placed an order for 60 - 10mg Valium tablets, 50 - 75 mg generic Tamiflu capsules, and 30 - 100 mg Viagra tablets. Upon checkout, we were redirected to the website HTTPS://EPHARM4U.RX-PURCHASE.COM (hosted on IP address 95.142.17.9). At this site, we created an online account, provided delivery information, and then provided payment information (Western Union). There was a block entitled "Medical Details" asking if we would like to fill in a medical questionnaire but we left this block blank. We then submitted the order and were redirected back to the EPHARM4U.COM website. At no point during this transaction were specific medical questions answered nor was a prescription required before placing the order.

32.     Shortly thereafter, we received an email confirming the order from Support@Medsupportonline.com listing a phone number of 888-837-4705. We also received an email directing us to send a Western Union wire transfer to "Ronald Maniego" of Binan, Laguna, Philippines. On September 21, 2011, an amount of money was sent via Western Union to this recipient.

33.     On October 3, 2011, two packages were received at a PO Box maintained by HSI in New Hampshire. The first package was shipped via USPS tracking number 9400 1102 0082 9167 1502 59 with a return address of HT Trading, 5380W 34St, PMB 114, Houston, TX. An inventory of this package found that it contained one prescription bottle labeled Valium Brand,

10mg, Batch # V10-DZP0091, MFG Date 01-2010. Inside the bottle were 60 round, blue tablets scored "Roche 10". FCC lab testing revealed that an average of 9.3 mg/tablet of diazepam (93% of the declared amount) was found to be present in the tablets. However, the tablets were consistent with authentic, foreign Valium tablets.

34.     The second package was shipped via USPS tracking number 0310 0480 0000 4588 1677 with a return address of Steve Vasquez, 271 Lakeview Ct, Cary NC. An inventory of this package found that it contained 31 blue diamond tablets in 9 blister packs marked "Viagra Pfizer 100mg Sildenafil Tablets" with a lot number of B314833021 and an expiration date of 04 2014.

35.     On October 4, 2011, Brian Donnelly, Pfizer Director of Security, Americas Region, confirmed that this lot number and expiration date were a well known counterfeit lot number/expiration date combination. Subsequent lab analysis conducted by Pfizer and FCC confirmed that these were counterfeit tablets.

36.     On October 13, 2011, a third package was received at a PO Box maintained by HSI in New Hampshire. The package was shipped via Priority Mail with tracking number RY009506307CH with no return address. An inventory of this package found that it contained 60 capsules in 6 blister packs marked "Antiflu 75mg" manufactured by Cipla Ltd of India with a batch number of X90430 and an exp date of 04/2012. FCC lab testing revealed that an average of 73 mg/tablet of oseltamivir (97% of the declared amount) was found to be present.

37.     Investigation has revealed that all three packages were tracked by an IP address which appears to originate in Tbilisi, Georgia.

**UC Buy 3 – 101GENERIC.COM**

38.     On September 22, 2011, an HSI Special Agent and I accessed the website WWW.101GENERIC.COM and placed an order of 30 - 20 mg Levitra tablets and 90 - 2mg Ativan tablets.  Upon checkout, we were redirected to the website HTTPS://101GENERIC.RX-PURCHASE.COM (hosted on IP address 95.142.17.9).  At this site, we created an online account along with payment information (Western Union). There was a block entitled "Medical Details" asking if we would like to fill in a medical questionnaire but we left this block blank. We then submitted the order and were redirected back to the 101GENERIC.COM website. At no point during this transaction were specific medical questions answered nor was a prescription required before placing the order.

39.     On October 12, 2011, two packages were received at an address controlled by HSI in New Hampshire.  The first package was shipped with a return address of Steve Vasquez, 271 Lakeview Ct, Cary, NC 27518. An inventory of this package found 33 tablets in blister packs marked "Bayer AG" "Levitra 20mg" with a lot number of BXB8551 and expiration date of 11-2014.  Subsequent lab testing by Bayer and FCC revealed that these tablets did not contain vardenafil, the active ingredient in authentic Levitra, but instead contained sildenafil.  Bayer further determined that talcum powder was found in the sample.

40.     The second package was shipped with a return address of Blue Zone, 3655 Mentone Ave, LA, California 90034. An inventory of this package found that it contained one prescription bottle labeled "Ativan 2mg Lorazepam" with a batch number of LR-0081T and expiration date of 03-2013.  FCC lab testing determined that an average of 1.8 mg/tablet lorazepam (88% of the declared amount) was found to be present in the tablets.  However, the tablets are consistent with authentic, foreign Ativan tablets.

**UC Buy 4 - John Green, JOHNG.PMEDS@GMAIL.COM**

41.     Subsequent to these purchases, several phone calls/emails were received from various sales representatives inviting investigators into the VIP Department offering better prices than listed on the website as well as bonus pills. On October 19, 2011, an incoming call from telephone number 800-920-0540 was received. An HSI undercover agent (hereinafter "UCA") spoke to a person identifying himself as Thomas with the Online Pharmacy and discussed the three packages that were the subject of UC Buy 2. Thomas stated that he belongs to the VIP Department and because of the dollar amount of the order, the UCA was asked to become part of the VIP Department where the UCA would be offered better pricing along with bonus pills. Thomas agreed to send an email with pricing details. Shortly thereafter, an email was received from Thomas Bergman at an email address of THOMASB.PMEDZ@GMAIL.COM. The email, which offered pricing for a variety of controlled and noncontrolled prescription drugs, listed Thomas' title as Sr. Account Executive, VIP Department, American Pharmacies along with a phone number of 877-372-0714 (according to telephone subscriber records, this phone number is subscribed to by Yahalom 3000 Ltd).

42.     On this same day, an email was received from John Green with an email address of JOHNG.PMEDS@GMAIL.COM (one of the email accounts previously obtained pursuant to a Search Warrant), stating that as part of their 11th anniversary as the mother company for more than 70 affiliate websites, they are giving customers at least 40% bonus pills on beginner packs of Ambien, Valium, Xanax, and Klonopin, limited to six packs per customer. At the bottom of the email, the following was listed:

"Premiummedz is the leading control substance company for more than

10 years and has more than 2,000,000 satisfied customers worldwide.

We operate seven call centers in the US, Canada, Germany, Greece,

Russia, Georgia, and Ireland. Premiummedz is the mother company

for more than75 affiliate websites online."

43.     The email listed a title for Green as Sr. Account Executive, VIP Department American Pharmacies and listed a phone number of 1-877-372-0714 x265.  Pursuant to these emails, a series of emails were exchanged with Green at JOHNG.PMEDS@GMAIL.COM whereby Green was told that the UCA buys prescription drugs from several suppliers but that the UCA was only concerned with the price and appearance of the pills.  The UCA told Green that the UCA sells to various stores and pharmacies along the East Coast and that the UCA sold pills to these pharmacies to mix in with their regular inventory/stock. This led to a series of telephone calls between Green and the UCA and an agreement to purchase 520 - 100mg Viagra tablets and 1050 - 2mg Xanax tablets for a total cost of $4,824.

44.     In an email from Green dated November 7, 2011, the UCA was instructed to send a wire transfer to West Block Investments Ltd at the Bank of Cyprus.  Shortly thereafter, a telephone call was received from Karen Jackson at an undisclosed telephone number.  During the call, Karen informed the UCA that, because of problems with suppliers in the area, they are not allowed to ship to New Hampshire, Missouri, and Colorado. [Agent Note: While Karen was not specific as to the reason why they couldn't ship to these locations, these locations are all believed to have investigations involving Meni BENISH, an individual previously implicated in the possession and sale of counterfeit prescription drugs discussed later in this affidavit.]  However, Karen, who stated she was located in Canada, offered to ship the pills to an address in a different state. Karen also advised that another option involved the UCA opening a US Postal Service box in a different state and having the mail forwarded to the UCA in New Hampshire.

45.     On November 9, 2011, an email was sent to Green at
JOHNG.PMEDS@GMAIL.COM, providing him with an address controlled by FDA/OCI in
Rhode Island to ship the pills.  On November 10, 2011, a wire transfer of $4,824 was sent to
West Block Investments Ltd at the Bank of Cyprus.

46.     Soon thereafter, four packages were received at the Rhode Island address.  The
first package listed a return address of White Dot, 1425 Rose Ave, LA, CA but was postmarked
and mailed from Forest Park, Georgia.  An inventory of this package found that it contained a zip
lock bag containing 941[3] white tablets scored "Xanax" and "2" (the package also included a
number of broken tablets that were not counted.) The other three packages were shipped with a
return address of Steve Vasquez, 271 Lakeview Ct, Cary, NC 27518. An inventory of these
packages revealed that they contained 525 blue diamond tablets scored "VGR 100" and "Pfizer".
Further, the tablets were in blister packs marked "Viagra Pfizer 100mg Sildenafil" with a lot
number of B314833021 and an expiration date of 04 2014.

47.     Subsequent FCC lab analysis of the tablets purported to be Viagra confirmed that
the tablets were counterfeit.  Specifically, FCC found that while the tablets were found to contain
sildenafil, the active ingredient in authentic Viagra, they also found that the tablets contained
tadalafil, the active ingredient in authentic Cialis.

48.     Subsequent FCC lab analysis of the tablets purported to be Xanax confirmed that
the tablets were counterfeit.  Specifically, FCC found that the tablets did not contain any
alprazolam, the active ingredient found in authentic Xanax.  Instead, FCC found that the tablets
contained 17mg diazepam, the active ingredient found in Valium.

---

[3] The UCA had negotiated a total purchase of 1,050 Xanax tablets. Due to the fact that this package contained only
941 tablets, a subsequent package was received at the PO Box containing 196 Xanax tablets (also containing several
broken Xanax tablets).

49.      According to the website Drugs.com, the usual recommended dosage of alprazolam is 10mg per day and the usual recommended dosage of diazepam is 40mg per day.  If a person receiving the above "Xanax" tablets was taking this recommended dosage, the person would take 5 tablets per day (each tablet is purported to contain 2mg).  Therefore, if the person took 5 of these tablets, they would in fact be consuming 85mg of diazepam, over twice the maximum recommended dosage.

**UC Buy 5 - John Green, JOHNG.PMEDS@GMAIL.COM**

50.      After UC Buy 4, a series of communications with Green ensued leading to an agreement in January 2012 to purchase 3,270 Xanax tablets and 630 Cialis tablets and a wire transfer of $9,950 was sent to the same bank account in Cyprus.

51.      In late January 2012, six packages were received at a PO Box maintained by DHS/HSI in Cambridge, Massachusetts.  An inventory of these packages revealed that they contained 2,980[4] white tablets scored "Xanax" and "2" and 630 Cialis tablets.

52.      Subsequent FCC lab analysis of the tablets purported to be Cialis confirmed that the tablets were counterfeit.  Specifically, FCC found that the tablets were found to contain sildenafil, the active ingredient in authentic Viagra.

53.      Subsequent FCC lab analysis of the tablets purported to be Xanax confirmed that the tablets were counterfeit.  Specifically, FCC found that the tablets did not contain any of the active ingredient found in authentic Xanax and instead found that the tablets contained 18mg diazepam, the active ingredient found in Valium.

54.      In summary, investigators were able to purchase misbranded/counterfeit prescription drugs, including controlled substances, without a prescription from a licensed

---

[4] The UCA negotiated a total purchase of 3,270 Xanax tablets.  Due to the fact that this package contained only 2,980 tablets, a subsequent package was received containing 295 tablets (also containing several broken tablets).

practitioner and without consultation with a medical professional. Further, lab analysis revealed that the tablets purchased often contained the wrong active ingredient and in at least two occasions may be harmful to consumers.

### REVIEW OF EMAILS FROM PREVIOUS SEARCH WARRANTS

55.     Based on a review of emails obtained pursuant to the previously authorized search warrants by the court, the purchases described above, and other information gathered, investigation has revealed that a transnational organization/network exists consisting of (1) customer call centers located around the world including Israel, the Republic of Georgia, the Philippines, as well as other locations outside the United States, whereby US based customers can place orders, without a prescription, for various prescription drugs, (2) prescription drug suppliers located around the world including India, China, the Middle East, as well as other locations outside the United States that supply prescription drugs both directly to US customers as well as to drop-shippers located in the US, and (3) drop-shippers, otherwise known as re-mailers, that are established in the United States that receive large shipments of prescription drugs and mail these drugs to US customers. This organization/network is alleged to be involved with the illegal sale of prescription drugs and the illegal distribution of misbranded, adulterated, and/or counterfeit prescription drugs, some of which are controlled substances.

56.     Finally, this organization/network obtains the proceeds from these illegal sales (a) via a series of foreign bank accounts located in various parts of the world that are known to be high-risk countries for money laundering activities such as Cyprus, (b) through the use of oversees credit card merchant accounts located in various parts of the world including Israel and the Republic of Georgia, and (c) through the use of contacts in countries such as China and the

Philippines who receive payment for these illegal sales through the use of wire transfers made via Western Union and/or Money Gram.

## Suppliers Utilized by Organization

57.     Based on a review of emails obtained pursuant to the previously authorized search warrants for the email accounts, this transnational organization utilizes a number of suppliers located throughout the world to provide a current supply of prescription drugs to its customers. These suppliers, located in locations known for the illegal manufacturing and distribution of counterfeit drugs (i.e. China, India), can change over time for a variety of reasons including current inventory levels, complaints by consumers, law enforcement actions taken against distributors, etc. Based on a review of emails, it appears that the organization utilized approximately 30 different suppliers over various time periods.

58.     One of the email accounts obtained pursuant to a search warrant authorized by the court, Mike.Suppliers@Gmail.com, corresponds with numerous suppliers to coordinate shipments to customers and arrange for payment for their services/shipments. In 2011, the year in which the search warrant was authorized by the court, the following suppliers corresponded with Mike.Suppliers@Gmail.com:

| Frank USA | FRANKUSA@ROCKETMAIL.COM |
|---|---|
| Andrew | GAMPHARMA@HOTMAIL.COM |
| Chukky/Sarina | CHUKKY2007@HOTMAIL.COM |
|  | ALLENCOX10@HOTMAIL.COM |
| Pete UK | PIRK.CIALIO@YAHOO.COM |
| Drew | ZZSEC.PHARMA@GMAIL.COM |
| Jenny | XW521@HOTMAIL.COM |
| Medex | MARIA_MEDEXLTD@HOTMAIL.COM |
|  | MARIAMEDEXLTD@YAHOO.COM |

|  | MARIAMEDEXLTD@GMAIL.COM |
|---|---|
|  | OLGA_MEDEXLTD@HOTMAIL.COM |
|  | OLGA_MEDEXLTD@YAHOO.COM |
| Chuck/Jessica | JESS.PHARMA@GMAIL.COM |
| Dick | PUJJI_MEHTA@HOTMAIL COM |
|  | RENUMED@GMAIL.COM |
| Kirtar | PHARMA.SWASTIK@GMAIL.COM |
|  | AKGENERICS@YAHOO.COM |
| Arie | ARIEIK@HOTMAIL.COM |
|  | H-HELPDESK@HOTMAIL.COM |
| Vipro | SATHEESHKUMARHITECH@YAHOO.COM |
|  | SATHEESHKPILLAI@GMAIL.COM |
|  | SATHEESHUV@HOTMAIL.COM |

59.     Frank USA (Frankusa@Rocketmail.com) - In an email exchange in May 2011 between Frankusa@Rocketmail.com, Mike.Suppliers@gmail.com, and Liz.Suppliers@gmail.com, there is an exchange involving "XANAX" tablets shipped to one customer that were not real Xanax. Part of the exchange reads as follows:

> "Hello Frank,
>
> Please check the picture attached. First time customer 62_1062117042 got the pills which is on the top of the picture that is real Xanax 2mg. In the second order customer got the ones that are on the bottom of the pic. Please make sure to reship the one that is on the top real one.
>
> Regards, Liz"

The email had an attachment of a picture of three tablets, each with the imprint "XANAX". The tablet at the top of the picture appears to be authentic XANAX and the bottom two tablets appear to be identical to the "XANAX" tablets purchased in the undercover purchases by agents.

60.     Andrew (Gampharma@hotmail.com) - Exchanges emails with both
Mike.Suppliers@gmail.com and Liz.Suppliers@gmail.com informing them of the status of
particular shipments as well as providing package tracking numbers.  For example, in May 2011,
Gampharma@Hotmail.com sent an email with an attachment listing shipments of several
controlled substances (generic Ambien, Xanax, Valium) as well as other prescription drugs
(Soma, Tramadol, Klonopin) to US customers.  Further, the spreadsheet listed package tracking
numbers for these shipments indicating the packages were all shipped from India.

61.     Chukky/Sarina (Chukky2007@Hotmail.com & Allencox10@Hotmail.com) -
Emails were exchange with both Mike.Suppliers@Gmail.com and Liz.Suppliers@Gmail.com
discussing shipments of Viagra, Cialis, and Levitra to customers as well as providing package
tracking information indicating the shipments were sent from Hong Kong.  Additionally, one
email sent by Chukky2007@Hotmail.com provides pictures of Viagra, Levitra, and Cialis tablets
in blister packs appearing identical to the tablets purchased by agents in the above uc purchases.
In addition, on several occasions, Mike.Suppliers@Gmail.com sent emails to both
Chukky2007@Hotmail.com andAllencox10@Hotmail.com when discussing shipments of
prescription drugs to customers.

62.     Pete-UK (Pirk.Cialio@Yahoo.com) - On several occasions in 2011, emails were
exchanged with both Mike.Suppliers@Gmail.com and Liz.Suppliers@Gmail.com discussing
pricing on various prescription drugs, details for a bank account in China, as well as wire transfer
details for shipments made by Pirk.Cialio@Yahoo.com.

63.     Drew (Zzsec.pharma@Gmail.com) - In 2010 and 2011, emails were exchanged
with Mike.Suppliers@Gmail.com and Liz.Suppliers@Gmail.com discussing complaints
regarding Phentermine (a Schedule IV Controlled Substance) quality, tracking numbers for

shipments to customers, and issues concerning the shipment of pills in bottles with no prescription labels. In addition, in a May 2011 email exchange, Liz.Suppliers@Gmail.com informs Zzsec.pharma@Gmail.com about a request to reship "GG249". The Xanax purchased by agents in the undercover transactions discussed earlier in this affidavit came in bottles/packages with prescription labels labeled, in part, Batch # X2-GG24900.

64.     Jenny (XW521@Hotmail.com) - From 2008 to 2011, emails were exchanged with Mike.Suppliers@Gmail.com and Liz.Suppliers@Gmail.com discussing shipments to customers located in the United States, tracking numbers for shipments, and issues involving reshipments to customers. One email exchanged with Mike.Suppliers@Gmail.com in April 2009 included an attachment with pictures of a shipment to a customer. The pictures were of blister packs labeled Viagra with a lot number of B314833021. This is the same lot number on the Viagra purchased by agents from the website Epharm4u.com and confirmed to be counterfeit Viagra.

65.     Medex - In 2011, Maria, with an email account Maria@Medexltd.com, and Olga, with an email account Olga@Medexltd.com, both corresponded with Mike.Suppliers@Gmail.com concerning customer shipments/tracking numbers, shipping methods, prescription drugs available along with pricing details. Both Maria and Olga listed additional email accounts as points of contact - Maria (Maria_Medexltd@Hotmail.com, Mariamedexltd@Yahoo.com, Mariamedexltd@Gmail.com) and Olga (Olga_Medexltd@Hotmail.com, Olga_ Medexltd@Yahoo.com).

66.     Chuck/Jessica (Jess.Pharma@Gmail.com) - In 2011, emails were exchanged with Mike.Suppliers@Gmail.com discussing several customer orders and shipments to Canada from the UK. At the bottom of the email, Jessica lists her title as Account Executive of

Pharmadropship.com. According to the website WWW.PHARMADROPSHIP.COM, this company is the world's largest drop shipping service for pharmaceutical products, offering hundreds of "high demand" medications for worldwide delivery. Further, according to the website, some of the best sellers include Viagra, Cialis, and Levitra.

67.     Dick (Pujji_Mehta@Hotmail.com, and Renumed@Gmail.com) - In 2011, emails were exchanged with Mike.Suppliers@Gmail.com discussing pricing for numerous prescription drugs, shipping charges, tracking details, bank account details, and Customs seizures.

68.     Kirtar (Pharma.Swastik@Gmail.com, Akgenerics@Yahoo.com) - In 2010 and 2011, emails were exchanged with Mike.Suppliers@Gmail.com discussing banking details, wire transfers, issues concerning pills shipped to customers, and Customs seizures.

69.     Arie (Arieik@Hotmail.com) - In 2010 and 2011, emails were exchanged with Mike.Suppliers@Gmail.com discussing customer shipments, issues concerning Customs, maximum order sizes requirements, and payment/banking information. Additionally, in March 2010, Arie informed Mike.Suppliers@Gmail.com that he has someone he identified as Tony managing his financials and that Tony ships from Italy. Arie lists Tony's email address as H-Helpdesk@Hotmail.com.

70.     Vipro (SATHEESHKUMARHITECH@YAHOO.COM, SATHEESHKPILLAI@GMAIL.COM, and SATHEESHUV@HOTMAIL.COM) - In 2010 and 2011, Satheesh Kumar, General Manager of Vipro Lifescience exchanged emails with Mike.Suppliers@Gmail.com and Liz.Suppliers@Gmail.com using an email account of Satheesh@Viprolifescience.com discussing pictures of new packaging for Cialis and Viagra, shortages of generic Cialis, banking details, and an order placed by a customer in Illinois who ordered generic Viagra. [Based on a search of the FDA website, there are no generic equivalents

to either Viagra or Cialis approved by FDA for distribution in the U.S.]  At the bottom of these emails, Kumar lists his additional email addresses as Satheeshkumarhitech@Yahoo.com, Satheeshkpillai@Gmail.com, and Satheeshuv@Hotmail.com

**Control of Organization**

71.     In the previous search warrants authorized in this investigation, a series of email accounts were obtained for sales people working in the Yahalom 3000 Ltd. call center in Israel, the management of this call center, several email accounts of people involved in the process of arranging the distribution of prescription drugs to customers as well as arranging for payment to the network of drug suppliers utilized by the organization.  Investigation has revealed that the owner of the call center is Eliad Yahalom with an email address of Diamond.thediamond@gmail.com.

72.     Additionally, earlier in this affidavit, telephone subscriber information for the toll-free phone numbers used by the call center revealed that Online 365 of Ramat Gan, Israel was the subscriber to the phone numbers until February 2011 when the telephone company was "notified by customer that they have sold the business to one of their employees" and the new customer was identified as Yahalom 3000 Ltd.

73.     One of the email accounts previously obtained pursuant to the search warrant was Ineedlead@gmail.com.  Based on a review of this email account, an email was located that was sent on November 12, 2009 from an individual identified as Meni BENISH with an email account of M@Mediaxp.com.  According to the email, BENISH was the CEO of Online365 for the last five years but that effective 1.11.09 (believed to be November 1, 2009) he was stepping down as CEO and he announced that Sharon Engel was taking over as CEO.

74.     According to information obtained from Mickey Arieli, Director of the Pharmaceutical Crime Unit of the Israel Ministry of Health, Meni BENISH has been implicated in the past with the sale of counterfeit drugs as early as 2001. According to Arieli, BENISH obtained counterfeit drugs from several countries that are known to law enforcement to be involved with the manufacture and distribution of counterfeit drugs, namely India and China.

75.     Based on a review of email accounts obtained pursuant to search warrants previously authorized in this investigation, as of 2011 BENISH appears to be in control of this trans-national investigation including decisions involving personnel, locations and set up of new call centers, and negotiating a Telemarketing Service Agreement with Yahalom 3000, owned by Eliad Yahalom.

76.     In September 2009, according to an email from Eliad Yahalom at Diamond.thediamond@Gmail.com, Yahalom was flying to India to organize a new call center. One of the recipients of this email was Meni@Online365.biz, believed to be Meni Benish's email account at Online365. Shortly thereafter, Benish receives another email with an attachment entitled Call Center India - Ontop365.doc. The attachment, which was sent from an entity identified as Call Centers India Inc. to Ontop365, is an agreement to give Call Centers India permission to provide outbound sales and call center services, that Ontop365 will provide calling lists, and that both Call Center India and Ontop365 will make cooperative decisions over the agents working in the call center. Further, on October 16, 2009, Benish sent an email from Meni@Online365.biz discussing the operation they were setting up in Budapest, that they were in the process of locating an office and were advertising for agents.

77.     In November 2009, Sharon Engel sent an email from Sharon@Online365.biz to Benish at email addresses M@Mediaxp.com and Meni@Online365.biz discussing the quality of

the salespeople for the India call center, the cost and potential revenue of the call center, and giving the call center about 300,000 records for the years 2004-2007 to test.

78.     In July 2010, Benish from his email account Meni@Online365.biz and Yahalom at Diamond.thediamond@Gmail.com exchanged emails discussing a Telemarketing Service Agreement between Yahalom 3000 and Benish. One of the emails contains an unsigned copy of the agreement written in Hebrew. Using Google and translating the agreement into English, the agreement is between a Client (not specified who the Client is) and the Company Yahalom 3000. The agreement states that the Company is a telemarketing company specializing in telemarketing and call center services and the Client is a company that owns and operates different internet sites including sites that offer the public purchase of different products and services. Further, Yahalom 3000 is expected to provide telemarketing and call center services in order to increase the sales of products and services sold through the sites as long as the Client provides the necessary items for regular work such as a proper campaign system, back offices, data bases, search systems, and VOIP (Voice of Internet Protocol). Finally, the agreement also provides that all products, services and intellectual property being used or sold in the internet sites are legal, both in the state of origin of the products and the state of destination of the products.

79.     On December 13, 2010, Benish sent an email from M@Mediaxp.com to Yahalom at Diamond.thediamond@Gmail.com providing a resume of a potential customer service representative to work at the call center.

80.     In December 2010, Benish exchanged emails from his email account M@Mediaxp.com and an unknown person with an email account of Mbieg@Hotmail.com discussing pharmaceutical leads that Mbieg was selling for $.30 each. The emails indicate there are 20,000 leads available containing customers name, address, city, state, phone number, email

address, IP address, order amount, how the customer paid, the product that was ordered, and the quantity ordered. Benish requested a listing of 500 customers so that he can have it tested before deciding whether he wanted to purchase the entire list. The email contained an attachment listing hundreds of US customers names, addresses, telephone numbers, email addresses and purchase details for prescription drugs such as Viagra, Soma, Ambien, Levitra, Cialis, Valium, and Phentermine. After receiving the list, Benish forwarded the list to Yahalom at Diamond.thediamond@Gmail.com requesting that the file be tested and to report back to him after testing.

81.     In early 2011, a series of emails were exchanged between Benish at M@Mediaxp.com and Yahalom at Diamond.thediamond@Gmail.com discussing the set-up of a new call center, the layout of the call center, and the requirements of the call center. In an April 2011 email, Yahalom provides Benish with price quotes for computers, workstations, chairs, kitchen appliances, and desks. Yahalom states in the email "We R trying 2 buy the computers + workstations from the same place, it'll reduce the price. Keep in mind the workstations include acoustics + electricity, unlike the workstations I have in Israel." Benish responded asking Yahalom to reduce the number of workstations to 12 and asking if he could find tables that were less expensive.

82.     Based on an email received by Yahalom, this new call center is located on the former Clark Airbase, believed to be referring to the former US Clark Airforce Base located in the Philippines. This is also the location agents were instructed to send a Western Union wire transfer that was identified earlier for UC Buy #2.

83.     According to records obtained from Google, the email account M@Mediaxp.com is hosted by Google.

**Additional Email Accounts**

84.     On January 20, 2011, Mrobinson225@Gmail.com sent an email to
Shany@Online365.biz requesting that the email address Bulkordersonline@Gmail.com be added
to the websites for bulk orders.  On April 17, 2011, Shany@Online365.biz sent an email to
Nancyd1979@Gmail.com , Sharon Engel at Sharon@Online365.biz, and
Mrobinson225@Gmail.com informing them that the bulk option related to the
Bulkordersonline@Gmail.com was existing and working on several websites including
101Generic.com and Epharm4u.com, the two websites that were the subjects of the UC buys
earlier in this affidavit.

85.     On March 24, 2010, Mike.Suppliers@Gmail.com sent an email to a group of
individuals, one of which was Eliad Yahalom, informing them that he established a new email
address of Mikesupman@Gmail.com.

86.     On May 23, 2011, Mike.Suppliers@Gmail.com sent an email addressed to the
suppliers informing them that he was going abroad for a few years to finish his MBA degree.  He
also informed the suppliers that his replacement was going to be Alexander with an email
address of Alex.Suppliers@Gmail.com.

87.     On several occasions, Vanessa Cooper at Acooper.Vanessa@Gmail.com
corresponded with Mike.Suppliers@Gmail.com informing him about wire transfers being made
to specific suppliers, the amount of the wire transfers, the beneficiary name, and the specific
bank account details.

## DEA Registration

88.    On March 17, 2011 and again on January 20, 2012, I consulted with the Drug

Enforcement Administration (hereinafter "DEA") and was informed that DEA has not issued any

online/Internet registrations.

## Email Preservation Requests Pursuant to 18 U.S.C. §2703(f)

89.    Requests pursuant to Title 18 United States Code, Section 2703(f)(1) were faxed

to the respective email providers Yahoo, Google, and Microsoft  requesting that all stored

electronic communications associated with the accounts identified below and in Attachment A be

preserved. Consequently, there is probable cause to believe that evidence is still present at the

email providers, irrespective of whether the underlying business is still ongoing.

| Yahoo | FRANKUSA@ROCKETMAIL.COM | November 1, 2011 & March 12, 2012 |
|---|---|---|
|  | PIRK.CIALIO@YAHOO.COM<br>AKGENERICS@YAHOO.COM<br>SATHEESHKUMARHITECH@YAHOO.COM | November 30, 2011 & March 12, 2012 |
|  | MARIAMEDEXLTD@YAHOO.COM<br>OLGA_MEDEXLTD@YAHOO.COM | March 15, 2012 |
| Google | ZZSEC.PHARMA@GMAIL.COM<br>JESS.PHARMA@GMAIL.COM<br>PHARMA.SWASTIK@GMAIL.COM<br>ACOOPER.VANESSA@GMAIL.COM | November 2, 2011 & March 12, 2012 |
|  | SATHEESHKPILLAI@GMAIL.COM<br>RENUMED@GMAIL.COM | November 30, 2011 & March 12, 2012 |
|  | MIKESUPMAN@GMAIL.COM<br>LIZ.SUPPLIERS@GMAIL.COM<br>ALEX.SUPPLIERS@GMAIL.COM | December 8, 2011 & March 12, 2012 |
|  | MARIAMEDEXLTD@GMAIL.COM | March 15, 2012 |
|  | M@MEDIAXP.COM | August 31, 2011, November 30, 2011, & April 11, 2012 |

| | | |
|---|---|---|
| | BULKORDERSONLINE@GMAIL.COM | March 15, 2012 |
| | MROBINSON225@GMAIL.COM<br><br>NANCYD1979@GMAIL.COM<br><br>MIKE.SUPPLIERS@GMAIL COM | April 13, 2012 |
| | JOHNG.PMEDS@GMAIL.COM | April 25, 2012 |
| Microsoft | GAMPHARMA@HOTMAIL.COM<br><br>ALLENCOX10@HOTMAIL COM<br><br>PUJJI_MEHTA@HOTMAIL.COM<br><br>ARIEIK@HOTMAIL.COM | November 1, 2011 & March 12, 2012 |
| | CHUKKY2007@HOTMAIL.COM<br><br>SATHEESHUV@HOTMAIL.COM | November 30, 2011 & March 12, 2012 |
| | XW521@HOTMAIL COM | April 2, 2012 |
| | MARIA_MEDEXLTD@HOTMAIL.COM<br><br>OLGA_MEDEXLTD@HOTMAIL COM | March 15, 2012 |
| | H-HELPDESK@HOTMAIL.COM | April 11, 2012 |

## TECHNICAL BACKGROUND

90.     In my training and experience, I have learned that the email providers provide a variety of on-line services, including email access, to the general public.  The general public can obtain an account by registering with the email providers and, during the registration process, the email providers may ask subscribers to provide basic personal information.  Therefore, the computers of the email providers are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for the respective subscribers) and information concerning subscribers and their use of the email providers' services, such as account access information, e-mail transaction information, and account application information.

91.     In general, an e-mail that is sent to an email provider's subscriber is stored in the subscriber's "mail box" on the email provider's servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on these servers indefinitely.

92.     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to the email provider's servers, and then transmitted to its end destination.  The email providers often save a copy of the e-mail sent.  Unless the sender of the e-mail specifically deletes the e-mail from the email provider's server, the e-mail can remain on the system indefinitely.

93.     An email provider's subscriber can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by the email providers.

94.     Subscribers to the email providers might not store on their home computers copies of the e-mails stored in their email account.  This is particularly true when they access their email account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

95.     In general, e-mail providers ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account.  This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

96.     Email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on

which the account was created, the length of service, records of log-in (i.e., session) times and

durations, the types of service utilized, the status of the account (including whether the account is

inactive or closed), the methods used to connect to the account (such as logging into the account

via the email provider's website), and other log files that reflect usage of the account. In

addition, email providers often have records of the Internet Protocol address ("IP address") used

to register the account and the IP addresses associated with particular logins to the account.

Because every device that connects to the Internet must use an IP address, IP address information

can help to identify which computers or other devices were used to access the e-mail account.

97.     In some cases, email account users will communicate directly with an email

service provider about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Email providers typically retain records about such

communications, including records of contacts between the user and the provider's support

services, as well records of any actions taken by the provider or user as a result of the

communications.

98.     In my training and experience, evidence of who was using an e-mail account may

be found in address books, contact or buddy lists, email in the account, and attachments to

emails, including pictures and files.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

99.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require the email providers to disclose to the government copies of the records and other

information (including the content of communications) particularly described in Section I of

Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

100.   Based on evidence gathered during the current investigation, I respectfully submit that there is probable cause to believe that the email accounts identified in Attachment A maintained at Google, Yahoo, and Microsoft contain evidence of commission of: (a) introduction into interstate commerce of unapproved new drugs (Title 21 U.S.C. Sections 331(d) and 355); (b) introduction into interstate commerce of misbranded drugs (Title 21 U.S.C. Sections 331(a) and 352(f)(1) and 353(b)(1); (c) distribution of controlled substances (Title 21 U.S.C. Sections 841 and 846); and (d) trafficking in counterfeit merchandise (Title 18 Section U.S.C. Section 2320(a)).

101.   This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation." 18 U.S.C. § 2703(a).

102.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

103.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my

training and experience, I have learned that online criminals actively search for criminal

affidavits and search warrants via the Internet, and disseminate them to other online criminals as

they deem appropriate, e.g., by posting them publicly online through the carding forums.

Premature disclosure of the contents of this affidavit and related documents may have a

significant and negative impact on the continuing investigation and may severely jeopardize its

effectiveness.  A Motion to Seal is filed herewith.

Respectfully submitted,

David Furtado
Special Agent
FDA/Office of Criminal Investigations

Subscribed and sworn to before me on May 8, 2012:

Landya B. McCafferty
United States Magistrate Judge